We will take up Rogers v. Galaza. I believe that all three of the issues are equally important, but I, you know, I would like to discuss first the outrageous conduct and then the three-strikes issue, because I think they're somewhat related, and then if I have time to go into the jury coercion issue. The Court, I'm sure, is very familiar with the facts, but we go in, in terms of the outrageous conduct issue, the Supreme Court recently reiterated and reaffirmed that this, under the Roshin shock-to-conscience standard in the Chavez v. Martinez case, that that is a viable 14th due process claim. And the – what happened in this case clearly shocks the conscience under any standard. The – Well, we kind of had tricks both ways here, didn't we? Pardon me? We had tricks going both ways here. I'm sorry, I didn't understand. What I said was it appears in – on this record that we have tricks going both ways. First, the police disguise themselves and disassemble and talk him into doing a deal, and so then he brings a piece of concrete. Well, yes. I mean, I think it's – it's – what's, you know, shocking is it's not just in the piece of concrete, but we have a police officer, or two police – several police officers, actually, involved in this ruse. That's their terminology, who admit that they are out to try to ensnare anyone that they could to sell them drugs. That they pull this ruse on the street in front of not only Mr. Rogers, but his fiancé and two small children involving guns that they drew. It's frightening. It's somewhat dangerous. And then Mr. Rogers pestering both the fiancé, which the district – which the trial court clearly believed that – that she did – the police officer did approach the fiancé, and when she was unsuccessful in doing that, kept pestering Mr. Rogers, who then went and did not give her drugs, but gave her a pebble of concrete. It's just – of course, many people are shocked by the fact that this is even a crime to begin with. And the counterfeit-controlled-substances statute, which is going to go into my three strikes argument, clearly did not intend to prevent this kind of behavior. This is not an individual on the trial court emphasized who was out – who was a drug dealer and who was seeking to take advantage of innocent, vulnerable addicts. This is not what happened at all. It's also important that the police officer testified that she knew immediately when Mr. Rogers handed her this concrete, this pebble, that it wasn't a drug at all. And yet, Mr. Rogers now finds himself incarcerated for the rest of his life. But does that have to do with the outrageous conduct you're talking about? The – what is more outrageous about this kind of a staged situation than the informant doing – getting into a gang or getting into a conspiracy and so forth? It seems not that much worse as far as conduct. Well, I think that there are many situations where there are informants that are used to set up and entrap unmarried people. I think that the difference here is that most of those other situations involve – and it always turns on – involves a situation where was this individual really predisposed and would he have done what he, you know, did? Would he have gotten involved in drug dealing but for constant badgering by an informer or by the police? And in this particular case, here is an individual who, within a very short period of, you know, brief matter of minutes, I guess, did not engage in drug dealing as we understand that. That sounds more like an entrapment defense. Was that raised? Yes. That was his defense at trial, Your Honor. And again, then I was into the jury coercion issue. It was a very close issue here. And I think the outrageous is in terms of the shocking the conscience. Again, we have to consider everything that happened here. And it would be outrageous conduct even if Mr. Rogers had only spent a couple days in jail. The jury found no entrapment? I'm sorry? The jury found no entrapment, right? The jury ultimately did, Your Honor, convict Mr. Rogers. So they had to have found no entrapment if it was raised. Well, it was a close call. I mean, we had the jury was hung three times on this issue. The jury asked numerous questions. We don't know what issue, do we? Pardon me? We don't know what issue they were hung on. I think we do because the jury asked a number of questions before it came out and said that it was deadlocked. They asked for definitions of the term coaxing, cajoling, and so on. They asked other questions. They were all centered on the entrapment issue. And the judge asked clearly centered on the entrapment issue. I think that that's unmistakable. The other thing is that when the jury said that it was deadlocked, it had taken three votes, and it was like four, seven, you know, not evenly split, but closely even split, and it was clearly on this entrapment issue. And then the court stated that it did not believe the jury had been deliberating long enough and wanted to know what it could do to assist the jury, what it could do to assist it in reaching a unanimous verdict. And it suggested readbacks. No, he just said assist them in getting a verdict. He didn't say he wasn't trying to get them to come out either way, was he? You mean guilty or not guilty? No, but I don't think that's the issue, Your Honor. I think the issue is exhorting the jury to reach a verdict, period. And I think that that's the coercion issue that the cases do not sit as the judges include, because if the judge is trying to get the jury to convict, that would be an impartial judge problem. But, you know, we're talking about. He did not give the typical Allen instruction. The typical Allen instruction has the cautionary language. But. No. I think this is more like the de facto. I mean, he clearly did what he he clearly used the language. But Allen instruction is acceptable if it's in a particular form. Right. But this is not. Yes, it is. But it's not. This is not a purely a case of an Allen charge. It's not unconstitutional. But it is the totality of what happened here. It is. Or not erroneous. Not unconstitutional. We've held it's not erroneous. Well, but it is unconstitutional to coerce a verdict out of a jury, irrespective of whether it is the classic Allen charge. And in here, again, this is a jury that was three times deadlocked on this entrapment issue that was told by the judge that it was not particularly happy. I mean, the judge didn't say, I'm not happy with you. But he said, you know, I don't think you've been deliberating long enough. This was a very, very short case, a very simple issue. And the jury said, you know, well, would it help to go back? And he said, no. But we'll try. And what can I do to assist you in reading a unanimous verdict? How about asking for readbacks? And then, in fact, that's what the jury did. Let me ask you, given that they did do that, how is the state court decision an unreasonable application of Federal law or contrary to Federal law? I'm sorry. Which case? The state court decision that discusses that issue. On the jury? Right. On the jury coercion issue. On the jury coercion issue. Isn't that what we have to find, that it is an unreasonable application or contrary to Federal law? The state court's opinion is on the jury coercion issue. It was objectively unreasonable because it left out so many of the facts regarding what actually happened in this case. It left out the fact that the court had said the jury had not been deliberating very long. It left out the fact that the court said, is there anything I can do to assist the jury in reaching a unanimous decision? It left out the fact that the jurors first said, when it said, can you, you know, would it help to go back? And the jurors said, no. It left that out. And it left out the fact that it said, well, we're pretty deadlocked, Your Honor. It left all of these things out. And under the recent case of Wiggins versus the Wiggins case, I mean, the record here, while it's not contrary to what happened, it left out so much of it that it gives an incorrect impression of what really happened. And having left out one or two facts, but having left out so many of these critical facts, including the statement about reaching a unanimous verdict, those buzzwords, so to speak, I think that's very critical. And that's why, under the AEDPA, that decision is also objectively unreasonable. I – in turning to the three strikes issue, the first thing I would say is that Mr. Rogers has already served more than twice the statutory maximum of the offense that he was convicted of. And if the Court, for example, were to reverse on the jury coercion issue and remand it for a new trial, I think the Court still needs to review the three strikes issue because he's – as I said, he's already served twice the statutory maximum. In terms of the three strikes issue, there's a lot of belief, I think, since the cases of Ewing and Andrade were handed down, that this is a dead issue and that there's cruel and unusual punishment for noncapital cases. I think, however, going back to the very reasoning of Ewing and, of course, Andrade, but Ewing in terms of what is the state of the law under the Eighth Amendment, that this case still qualifies as a cruel and unusual punishment case. And I want to talk – the U.S. Supreme Court focused very heavily on the primacy of the legislature and the purpose of deterring recidivism, which was the primary purpose. And in this particular case, yes, there isn't any argument that Mr. Rogers had a terrible, very serious prior record. But what happened in this case is not recidivism in the sense that the three strikes statute was enacted to prevent, and it is not even remotely close to what Mr. Ewing and Mr. Andrade did. I mean, these individuals – maybe we don't think petty theft is a big deal, but these were individuals that continued to voluntarily and willfully break the law without any plotting or cajoling or whatever it is from law enforcement. Nobody was begging them, you know, seducing them to come into the video store. Well, under the three strikes law, the legislature did not intend for this kind of recidivism, so to speak, to be punished. And the district – the trial court, excuse me, made a very – emphasized at her sentencing hearing that but for his prior record, she would – this case would be a misdemeanor. I mean, she emphasized that it was a – she said the word, the least aggravated type of offense. He wasn't out on the street corner, you know, trying to sell drugs to innocent people. He was – she even used the word somewhat coerced by the police officer who kept pestering him. And in terms of the legislature, again, also moving to the taking advantage of addicts, and that's not what happened in this case. Mr. Rogers was not a drug dealer. The police officer was certainly not an addict. And we're talking about, again, a pebble of concrete that he handed her because she kept pestering him. He thought she was an addict.  He thought she was an addict. We don't know exactly what he thought. Well, we know what she said to him, and we know he went and got the concrete and sold it to her. You know, it's difficult, though, to separate it from the pestering. I mean, again, I mean, if you look at it, the – the type of – the type of – the type of behavior that the counterfeit controlled substance statute, I think, is designed to prevent is the drug dealer who lured – himself is the one who was luring, you know, unwitting – We can't ignore what he said. He's – the entrapment was to make him sell to somebody he didn't know. Well, I'm glad the Court mentioned that. I'm not talking about this in terms of a sufficiency of evidence argument because that statement came in. But we cannot ignore the fact that this particular – the only reason that we have to believe that he said that is as a police officer who the trial court found had  conceded in both her opening argument and closing argument that this officer had credibility problems. And there's no other evidence whatsoever that this officer – that Mr. Rogers had, you know, prior drug sales in his background or had anything to do with drugs whatsoever. And so I think that it's not an insignificant comment. And also in terms of what happened here, I mean, having, you know, been a federal public defender in the past, I mean, a lot of these drug sales – scrupulous police officers are – you know, particularly when they're trying to entrap – I mean, they're not trying to entrap. That's not the bottom line. They're trying to arrest people – are usually much more careful, you know, about what is going on in these covert drug transactions in order to prevent themselves from being accused of having lured and entrapped somebody. And here there was – there was no – nobody wore a wire, nobody video-recorded it, or they were capable of doing it. And the police officer misrepresented not only about whether discovery existed, but she testified in very different – she contradicted herself as to exactly where the surveillance vans were and so on. So in terms of, you know, what she said that he said, I usually don't substitute it. The only basis that we have to believe that is the word of the officer whose word is worthless. I mean, there are very few cases where the judge comes out and says, this officer is not to be believed, you know. So in any event, I would ask the Court to take that into consideration. And in terms of what happened – I think there is a doubt, Your Honor, because, again, what is kind of strange here is that, according to her, she said he gave her this pebble of concrete, which she knew immediately was not drugs, and said, that will be $20, please. Well, isn't it a coincidence? She just happened to have one $20 bait bill on her, you know, and handed it over to him. So, you know, we don't really know. Well, is there any indication he didn't take it? Yes, he did take it, Your Honor. And I'm not – So he sold it. In that regard, certainly. He took it, whether he asked for it or not, whether he was just handing it to her to make her go away, we'll never know. And Mr. Rogers isn't going to testify in this particular case because of his prior record, obviously. Oh, no, no, no. I don't want your $20 bill. I just want to help you out. Here's this concrete. Well, you know, again, he was – I mean, he certainly – I wouldn't call this the good Samaritan drug deal, of course, you know, or anything like that, you know. You know, that's not what I'm talking about. But it is engaging – I mean, Mr. Rogers wasn't in the habit of standing on the street corner trying to get all the drug addicts in the neighborhood to buy pebbles of concrete from him to buy gas money or whatever it is. I mean, that just wouldn't happen. And I think that it's still – I mean, even if – even if he saw this as a means to, like, you know, get some cheap gas money or something like that, let's just save it, you know. And it was not, as I said, a good Samaritan, an altruistic thing he was doing here. It's still – it is one of the least aggravated type of offenses. And that is what the trial court repeatedly said. And but for his prior record, she would not have imposed this life sentence. And if the only reason that she is imposing a life sentence is his prior record, that is in, you know, in contrast of Yuting and Andrade, that would be double jeopardy. If the Court has no further questions, I'll save some time for rebuttal. Thank you. Good morning. Jaime Fuster for our Respondent, Warden Galaza. I would like to also start with the issue of outrageous government conduct. I think my first point is that the California – I mean, the United States Supreme Court has never held that a due process claim could be based on outrageous government conduct in an intractable type case like the instant one. I think when we look at the most important cases in this context, which are United States v. Russell and Hampton v. United States, both of those cases make clear that the Supreme Court has never ruled on this issue. And actually, when we look at the plurality opinion in Hampton, the Chief Justice Rehnquist says that there should never be an outrageous government conduct basis for a due process claim in the intractable kind of cases, while the concurrence in Hampton says that, well, you know, we have never – Russell didn't lift that question up, and we don't have to resolve it in this case because this case is controlled by Russell, and we don't have to – we can lift that question for some other time. And I think when we look at those cases, it's clear that the Supreme Court has never said, as far as clearly established Federal law within the applicable standard of review, that there is such a due process claim, especially in entrapment cases like the Hampton and Russell cases. I think Rushing is clearly a distinguishable case, and it didn't say one way or another whether entrapment – whether outrageous government conduct will apply to an entrapment case. But even somehow, there was a clearly established – Well, are you saying that the Supreme Court says that they – that outrageous government conduct does not apply in entrapment cases? I think the issue has not been resolved by the Supreme Court, and because it hasn't been resolved, there is no clearly established Federal law within the meaning of the applicable standard of review. The Supreme Court hasn't said one way or another whether this claim applies to entrapment type cases. It has been applied to, like, the Rushing case where, you know, clearly there was outrageous conduct by the government in illegally entering the defendant's residence. Why shouldn't it be applied to entrapment cases if the government conduct is outrageous? I think, for example, what Chief Justice Rehnquist said in the Hampton case is that the defense of entrapment is sufficient as a remedy to a defendant that complains about the conduct of law enforcement in leading to the arrest and, you know, conviction in the case. I mean, in whether there was – you know, whether he was in dues or not. It seems like there are two different policy considerations. One is really outrageous government conduct. The other is whether the person that's involved would have been otherwise inclined to buy the drugs. And I think this case does show that distinction, and I think all we have in this case is – I mean, clearly his remedy in this case was to raise a defense of entrapment trial, and that's what he was allowed to do. And the jury rejected it. Both the jury and then the trial court and the State Court of Appeals pointed out that there was sufficient evidence, more than sufficient evidence, to support the jury's determination that the Petitioner wasn't in dues by the actions of the law enforcement in this case. I think the fact that he didn't sell or give real cocaine to the undercover agent does show that he wasn't – his actions weren't induced by any sympathy toward what he perceived to be a, you know, a victim in this case, you know, an addict that really needed drugs. And I think the fact that he just gave her a piece of concrete so he could make some easy money shows that his actions were just on his own volition. They weren't the result of any rules or any sympathy that Deputy Medina may have inspired him. And I think that clearly defeats any kind of entrapment in this case. And actually, I think this Court has stated in several cases that to raise a claim of outrageous government conduct, the burden of proof in the defendant is much higher than in an entrapment case. And in this case, the Petitioner couldn't even show entrapment.  On a procedural point, Counsel, the issue of outrageousness was found to have been raised to the State court, but they never dealt with it or ruled on it. So I guess we're not bound by any State court determination. We just go ahead and make our own. Is that right? I don't believe so because the Court of Appeals, at least impliedly, at least if not explicitly, ruled on this issue when it dealt with the entrapment issue. Because under State law, entrapment has an objective standard which looks at the conduct of the law enforcement officers. And I think to the extent that the issue of outrageous government conduct was raised on appeal, what the Court of Appeals decided in this case was that there was sufficient evidence that to support the finding of the jury that there was no entrapment which required this objective determination, and also that there is no need to expand or deal with this outrageous government conduct under California law. And I think whether there is some specific mention of it in the opinion of the Court of Appeals or not, this Court still has to give deference to the decision of the Court of Appeals, whether the specific issue is dealt with at length or not. You know, this Court is still bound by the applicable standard of review and not engage in some kind of de novo determination. And I think the fact that the district court found that the issue was properly raised in the State courts does require that this Court give deference to the, you know, to that. They didn't make a decision on the outrageousness unless you're correct that you have to have entrapment first. I'm trying to understand the question. That the Court of Appeals didn't specifically rule on this issue. I think the point in this situation is that the defendant, the Petitioner himself didn't raise a specific claim of outrageous government conduct to be decided. I think the district court found that they had. Isn't that right? I think the district court found that it had in the petition for review to the California Supreme Court. Yes. And I think what happens is that I assume that that determination was made also in light of the fact that the Court of Appeals necessarily dealt with that issue because of the nature of the entrapment test on the California law. And otherwise, the issue would have been clearly unsubstantiated and not subject to any kind of determination by the district court. I think, but even if somehow this issue will be reviewed under the novel, the term standard, you know, there are too many reasons why he's not entitled to any, you know, any relief. And the first of all is because there is no clearly established Federal law. And second, because the conduct of the law enforcement officer wasn't fundamentally unfair. It wasn't shocking to some kind of sense of universal justice. It was just, you know, what has been approved in many other cases, you know, police using deception and using undercover activities to detect possible narcotic activities or to buy, you know, narcotics from a, you know, suspected dealer. And that's just what happened in this case. I mean, there's nothing outrageous as the word has been defined and used by both the Supreme Court and this Court. There's nothing outrageous about what happened in this case. I suppose it would be outrageous if this former drug dealer had really decided to go straight and that the police officer is not to be believed and they impugn and beg him to furnish something and he finally furnishes a piece of concrete. That would be pretty tragic, wouldn't it? I still wouldn't think that will, although that goes beyond maybe what happened in this case, that wouldn't raise to the level of outrageousness as the word is being used by the Supreme Court and the Ninth Circuit, by this Court. I think it has to be something that goes beyond just like something that we may feel may be wrong to do. It has to be something that offends, a universal sense of justice, something that is clearly unfair. And just giving the opportunity to somebody that may have been involved in the past in drug activities to yet commit another drug offense is not something outrageous. On what I was premising, it seems to me to be outrageous to put a man away for life. Well, that would be a separate issue. I think that when we look at the outrageous, whether the conduct of the law enforcement officer was outrageous, we're going to look at the sentence given because, you know, that's an independent issue. At the time he was at the time the officers created this ruse in front of the house, they didn't know who was going to come out. They didn't know anything about this specific defendant. They didn't know he was going to be subject to a three-strike sentence if he, you know, agreed to sell drugs. And all we have here is there was no prior relationship between the law enforcement officers on this specific Petitioner. There was only, you know, a few minutes of conversation. I think the officer may have asked him for drugs three times. That's all we have. And we're going to bootstrap the issue of the three-strike sentence to somehow cast the law officer's conduct as being outrageous, because that's a totally separate issue. The three-strike sentence that was imposed in this case was a judicial function, you know, a judicial action. It wasn't something that the law enforcement officers have any control over. And I would just like briefly just to mention that as part of the jury coercion claim, I mean, I think all the trial court did in this case was just trying to determine whether it was too early to declare a mistrial. I think that's something that he was required to do under state law. He asked, well, you know, he needed to know how far apart they were. I mean, they were like 4-7-1 and 5-7, and then he said, well, are you making any progress? And I think he finally got a response from the couple of jurors saying, yeah, we can make some progress. And that's what happened in this case. And then he just made himself available to provide any re-reading of testimony or something like that. I think the coercion issue is the strongest issue here, because applying the AEDPA standard, the state decision really does not accurately reflect what happened. And nor did what you just described it as having happened, happen. Because he asked them, you know, can you make progress? And their first answers were no. And then he went on to say, well, he'd like to help them in any way, make a unanimous decision. I think it's a very close question. And I think your opposing counsel misapprehended where I was going with the Allen instruction. The Allen instruction has been held to be not error and constitutional because it has very specific language that ensures the neutrality of the instruction so as to avoid any potential coercive impact. And here he didn't use the cautionary language. He didn't give as good of a de facto Allen instruction as we have approved. So, I mean, it might be a close question, but there's a real problem with this language about pushing for unanimity and chastising the jury for not being able to reach a decision. I think we have to look at the issue of coercion in light of the recent decision of the Supreme Court in early B. Packard, which, when we look at the facts of Packard, I mean, the showing of coercion was much stronger than anything that happened in this case. And, I mean, that's a case where the Court ascertained there was one single holdout juror, new identity of the juror, repeatedly instructed the jury how to deliver the Allen. And it's kind of a pretty much what it seems to be happening is that they didn't want any kind of a the holdout juror to be trying to decide the case with some kind of improper basis. I mean, there was clearly what, you know, it could be arguably perceived as coercion of telling the one holdout juror to deliberate based on the law and the facts, and also encourage or urge the jury to continue deliberating. And the U.S. Supreme Court stated that it was reasonable for the State Court not to find jury coercion in that case. And I don't think, based on the ruling in early, that it would be unreasonable for the State Court to find no jury coercion in this case. Also, I think an important point in this case also is that after the comments of the trial court, the jurors went back and deliberated for five hours, including asking for a re-reading of testimony. And that's a point that does look go very far away from a finding of coercion. And I think that clearly indicates that their decision was based on re-evaluating the evidence. It was based on, you know, it wasn't based on any kind of comments that were pretty neutral by the trial court. And actually, I think the fact that there was a significant split in the vote, I think it was 5-7, it also goes against finding any kind of coercion. We don't have here a situation that was 11 to 1, and, you know, the comments of the court may have put even more emphasis on let's reach a verdict and then push a 1-year to finally relinquish. Here we have a 5-2-7, we don't know which way they were going, and it's very doubtful that the comments of the trial court asking them, well, you know, can you make some progress, I can help you resolve this case, which is obvious in any case. I mean, the whole idea of sitting in a jury room is to resolve a case, but the court never said you have to do it and you have to do it this way or the other way. All it says is, well, it's too early to declare a mistrial, keep going at it, and that's what happened in this case. And what it had, you know, the ultimate outcome was they deliberated for 5 hours and they reached a decision in which either 5 or 7 years changed their mind. And it's hard to believe that 5 or 7 years would change their mind just because of the comments made by the court 5 hours before. And I think that clearly defeats any kind of jury coercion issue in this case. And not only that, but if we look at the early v. Packer decision, that in the Supreme Court it was constitutionally wrong by the court to tell the jurors to encourage the jurors to, you know, continue deliberating. I think that's, you know, so there is no clearly established Federal law that prohibits the court from telling the jurors, you know, you can make more progress, go on, continue deliberating. You know, you're not ready, you know, we're not ready for a mistrial in this case. And finally, as far as the free strike sentence imposed in this case, I think this place, this case clearly falls within Andrade and Ewan, and there is no possible way to distinguish it from those cases. Well, there is kind of a feeling you have that even in those cases where he had petty crimes, there would be the sort of thing that would be commonly recognized as a crime, if you steal something and so forth. Here we've got somebody who did not deliver drugs. Well, I think the first response to that is that California doesn't have this, even based on Petitioner's own research, California is not alone in having this type of statute. Seems like, except for Alaska, every single statute in this, every single state in this country has the same kind of, the same kind of statute prohibiting the sale of fake narcotics. And, you know, some of them are misdemeanors, some as a felony, but the sale of fake narcotics. Well, why is that a crime? Actually, I went back and I tried to figure out. From a policy standpoint, I'm just curious. Yeah, actually, I went back to one of the cases that dealt with the constitutionality of that statute, and they provided at least three or four different policy reasons. And I would like to tell the court, one of them was that under prior law, there was no real way to prosecute those savvy dealers that will give fake drugs to who they think may be like an undercover agent, because the state wanted to discourage all kind of narcotics activities, you know, whether they involve, you know, a real narcotics. It was to avoid the undercover agent situation. Is that why it's a crime? Well, the perceived problem was that there were savvy kind of dealers that were giving fake drugs to who they thought may be an undercover agent to avoid prosecution under the narcotics statutes. And that was something they wanted to close the loophole because they felt those those shouldn't get away with their activities, even if they were just testing the undercover. So that was one reason behind that. Another one was the one. That sure doesn't sound like a very good reason. Are there others? Well, another one was that the interest in the state in discouraging all kind of narcotics activities and the stuff that goes around it, the violence, prostitution. There's a lot of activities that are related to narcotics activities. We, you know, the state wanted to discourage what appears to be a narcotics activity, no matter what, whether it involves phony drugs or whether it involve real ones. And that was another one. A third one was to protect vulnerable addicts, which is the one provided by counsel before, you know, even though buying drugs may be an illegal activity. You know, so that if there was some interest in protecting should be able to rely upon the fact they're really getting the drugs that. Well, it's because the legislature felt that it's not it's an it's kind of another evil that has kind of come out of the narcotics transactions is that, you know, these people are really desperate and they're subject to even, you know, they're subject to, you know, to to abuse by dealers to, you know, even though we don't want people to be buying drugs is still protecting them so that they can really get the drugs. Well, I think it's that under the eyes of the law, everybody should be protected even if they are involved in what we consider to be an illegal activity. Still, they shouldn't be victimized by by dealers. And I think another important reason is that being involved in the sale of fake drugs could also lead to more violence like we don't need anymore. You know, a lot of the gang violence that we have in this is because of drug activities. And I think many of the violence comes out of people involved in fake sale of fake drugs. I mean, if you buy fake drugs from somebody, there is a big chance you're going to retaliate. And that would just lead to more violence. And I think that there is a strong policy consideration in avoiding that kind of unnecessary violence. So there are several reasons why. I mean, some of them may not be as good as others, but there were some reasons for the statute. All right. Thank you. Thank you. You had a couple of seconds. No, thank you. The case of Rogers versus Galazza will be submitted. The court will take a 10 minute recess while counsel changes places and resume in 10 minutes.
judges: B. Fletcher, Hug, Wardlaw